**Affirmed and Memorandum Opinion filed June 6, 2024.**



In The

# Fourteenth Court of Appeals

## NO. 14-23-00646-CV

## IN THE MATTER OF KENNITRA M. FOOTE

**On Appeal from the 412th District Court**
**Brazoria County, Texas**
**Trial Court Cause No. 114076-CV**

## MEMORANDUM OPINION

The question in this appeal is whether the trial court abused its discretion when it denied a former attorney's petition for reinstatement to the State Bar of Texas. Our answer is "no."

## BACKGROUND

Kennitra Foote became a duly licensed attorney in 2001. She started a solo practice, where she served clients in both civil and criminal matters.

In 2011, a client filed a professional grievance against Foote. An evidentiary panel of the State Bar of Texas found, among other things, that Foote failed to abide

by the client's decision of whether to accept a settlement offer, failed to promptly notify the client of the receipt of settlement funds, and failed to promptly deliver the funds that the client was entitled to receive. Foote did not contest the findings, and she agreed to a partially probated suspension of twenty-four months, with three of those months being under active suspension.

In the months that followed, nine more grievances were filed against Foote by other clients and professionals involved in Foote's cases. Foote did not contest these grievances either. She offered her resignation as an attorney, which the Supreme Court of Texas accepted in 2013 in lieu of disciplinary action.

In 2021, Foote filed a petition for reinstatement. The State Bar of Texas opposed the reinstatement, and the case proceeded to a nonjury trial in 2023. The trial court ultimately denied Foote's petition and issued findings of fact and conclusions of law.

Foote now challenges the trial court's judgment.

## ANALYSIS

To grant a petition for reinstatement, the trial court must make two findings. *See Bd. of Law Examiners of State of Tex. v. Gabriel*, 953 S.W.2d 227, 228 (Tex. 1997) (orig. proceeding). First, the court must find that the petitioner has satisfied her burden of proving by a preponderance of the evidence that she is of good moral character, is fit to practice law, and has led an exemplary life for the preceding five years. *Id.* (citing Tex. R. Disciplinary P. 11.02(E)). Second, the court must find that the petitioner has satisfied her additional burden of proving by a preponderance of the evidence that her reinstatement will serve the best interests of the public and the profession, as well as the ends of justice. *Id.* (citing Tex. R. Disciplinary P. 11.03).

The trial court here denied Foote's petition and expressly found that she had failed to satisfy these two burdens. We review the trial court's ruling for an abuse of discretion. *See Eggert v. State Bar of Tex.*, 606 S.W.3d 61, 65 (Tex. App.—Houston [1st Dist.] 2020, no pet.). Under this standard, we defer to the trial court's factual determinations if they are supported by the record, but we review its legal determinations de novo. *Id.* Generally speaking, the trial court's ruling must be upheld unless its decision is arbitrary, unreasonable, or decided without reference to guiding rules or principles. *Id.*

When ruling on a petition for reinstatement, the trial court may consider the following list of nonexclusive factors: (1) evidence concerning the nature and degree of professional misconduct for which the petitioner resigned and the circumstances attending the offenses; (2) the petitioner's understanding of the serious nature of the acts for which she resigned; (3) the petitioner's conduct during the disciplinary proceedings; (4) the profit to the petitioner and the hardship to others; (5) the petitioner's attitude toward the administration of justice and the practice of law; (6) the petitioner's good works and other accomplishments; and (7) any other evidence relevant to the issues of the petitioner's fitness to practice law and the likelihood that the petitioner will not engage in further misconduct. *See* Tex. R. Disciplinary P. 11.05.

Foote argues that the trial court abused its discretion because the final two factors favor her reinstatement.

With regard to her first burden—which required her to show that she is of good moral character, is fit to practice law, and has led a life of exemplary conduct for the preceding five years—Foote highlights her own testimony that she has pursued a career in education, doing both consulting work and tutoring underprivileged children. She refers to the testimony of two character witnesses, an

3

employer and a teacher, who each praised her for her manner and skills around children. As for her fitness to practice law, Foote emphasizes that she has completed fifteen hours of continuing legal education, and that she has subscribed to a legal newsletter that keeps her updated on appellate court decisions. And as for leading a life of exemplary conduct, Foote refers to her own uncontroverted testimony that she has become more involved in church, and that she has never been arrested or under criminal investigation.

With regard to her second burden—which required her to show that her reinstatement will serve the best interests of the public and the profession, as well as the ends of justice—Foote refers to the testimony that she is remorseful for her past actions and omissions, and that she has worked towards rebuilding her character in the community. She explains that she has done volunteer work. She also refers to testimony that she has laid the foundation for a legal services company, which she describes as "a cross between Legal Zoom and Wikipedia" that she hopes will serve as a resource for both lawyers and laypersons alike. She also refers to testimony that, if she is reinstated, she hopes to work more in education, lobbying, and legal aid.

Foote's arguments depend entirely on the credibility and demeanor of witnesses, none of whom the trial court was obliged to believe, even if their testimony was uncontroverted. *See City of Keller v. Wilson*, 168 S.W.3d 802, 815 (Tex. 2005) (explaining that uncontroverted evidence is not conclusive, and thus can be disbelieved, if a factfinder could reasonably determine that the evidence permits two inferences: either (1) the evidence is true, or (2) the evidence is not true). And even if the trial court did believe the core facts of the cited testimony, such as Foote's tutoring of children and participation in continuing legal education, the trial court was still not obliged to conclude that Foote satisfied her respective burdens by a

4

preponderance of the evidence, especially considering the countervailing evidence introduced by the State Bar of Texas.

This countervailing evidence included the history of Foote's professional misconduct. There was evidence that Foote had been administratively suspended from the practice of law three times for the failure to pay bar dues, and another three times (some of which were overlapping) for the failure to pay an occupation tax.

The countervailing evidence also included the nine additional grievances that were filed against Foote.

In the first of these grievances, the facts established that Foote had issued a letter of protection to a chiropractor, protecting $4,953 in fees for medical services rendered by the chiropractor to one of Foote's personal-injury clients. When the client's case settled, Foote did not disburse any portion of the proceeds to the chiropractor. And when the chiropractor learned of the settlement and demanded payment, Foote ignored the demand.

The second grievance involved a different chiropractor and a letter of protection for $4,153 in fees for medical services rendered to another personal-injury client. As with the previous grievance, when the client's case settled, Foote withheld a portion of the proceeds, but she never disbursed that portion to the chiropractor, even after the chiropractor had made her demands for payment.

The third grievance was filed by a client in a personal-injury matter. The evidence showed that Foote, or someone acting on her behalf, signed the client's name to a settlement release without the client's knowledge or consent. Foote received $38,262.62 in settlement funds, but she did not notify the client or disburse the funds. The client learned of the settlement a year later when he independently contacted the insurance company to learn of the status of his case. After the client

5

filed a grievance, Foote paid the client his share of the proceeds, but Foote did not provide an accounting showing that the payment was from the original settlement monies. She also failed to timely return the client's case file to the client's new counsel.

The fourth grievance was filed by two clients in a federal forfeiture action. When the case settled, Foote received three settlement checks totaling $91,902.38, all payable to the clients. But Foote, or someone acting on her behalf, signed the clients' names to the back of the checks without their knowledge or consent. Foote also endorsed the checks with her own name, even though she was not listed as a payee. Foote negotiated the checks, but then she falsely told the clients that the checks had to be returned and reissued because she was not listed as a payee. Since the checks had already been deposited, they were not reissued. Months later, Foote told one of the clients that a check had arrived, but she demanded the client to sign a release in Foote's favor before the client could receive the funds. The client refused to sign the release. The client also demanded the case file, which Foote failed to provide.

The details of the fifth grievance are not fully developed. The record merely reveals that the State Bar of Texas sent Foote a notice requiring her to respond to allegations of professional misconduct by a client in a criminal matter. Foote never responded as required.

The sixth grievance was filed by a client who had paid Foote a retainer of $350 for her assistance in obtaining an occupational license. A week after the client paid the retainer, Foote was disciplined and placed on active suspension for three months, with another twenty-one months of probation to follow. Because of the suspension, Foote did not assist the client in obtaining the requested license. Foote also failed to return the retainer.

The seventh grievance was filed by a man who had paid Foote $4,000 to seek habeas corpus relief on behalf of his brother. Foote never filed the writ. When the man later filed a grievance against her, Foote did not respond to it.

The eighth grievance concerned another habeas corpus client, who paid Foote $8,000 to file a writ. Foote prepared a "Memorandum," which was dated before her suspension. But during the period of her active suspension, she delivered the document to the client's wife and instructed the wife to file it with the court. Foote did not disclose to the client, his wife, or the court that she had been suspended from the practice of law.

The ninth grievance was filed by a client in a criminal case who had agreed to pay Foote a $5,000 fee. The client delivered a partial payment of $2,300 to Foote before her suspension, and another $700 during the period of her active suspension. Foote did not disclose to the client that she had been suspended from the practice of law, and she failed to refund the money upon the client's request.

When the Supreme Court accepted Foote's resignation in 2013, she was ordered to pay these aggrieved parties more than $118,000 in restitution as an absolute condition of her reinstatement. In 2021, shortly before she filed her petition for reinstatement, Foote tendered a full restitution payment to the Statewide Compliance Monitor. By then, the aggrieved parties had already been compensated by the State Bar's Client Security Fund. Foote's restitution payment was accordingly used to reimburse that fund.

The trial court recited these same facts in the following finding: "This payment was made after the above-named Complainants had already received payment from the State Bar's Client Security Fund and was therefore used to reimburse the Client Security Fund." Foote does not contend that this finding is factually inaccurate or unsupported by the evidence. However, insofar as the trial

court addressed the timing of her payment, Foote contends that the finding is irrelevant because the Supreme Court never ordered her to pay her restitution by a certain date.

But the timing is relevant because Foote delayed making her restitution payment by eight years. Foote did not explain this delay. Moreover, there was evidence that she could have tendered payment at least two years before she did. In particular, Foote testified that, in 2019, she made a capital contribution of at least $140,000 for the purchase of a pharmacy. Because that contribution was greater than her restitution, the trial court could have reasonably concluded that Foote had not held herself accountable for her prior decisions, which reflects negatively on her attitude toward the administration of justice, and her fitness to serve the best interests of the public and the profession.

The trial court made other findings regarding the pharmacy. One finding recited that Foote had filed a self-represented pleading for a temporary restraining order against her business partner. Another finding recited that, in that same litigation, the trial court signed an agreed temporary injunction restraining Foote from interfering with the pharmacy's business and operations.

Once again, Foote does not contend that these findings are factually inaccurate or unsupported by the evidence. Nevertheless, to whatever extent that the trial court considered this pharmacy litigation in ruling on her petition for reinstatement, Foote argues that the trial court abused its discretion because the evidence did not establish that any of her business dealings with the pharmacy were improper. Foote also explains that she agreed to the injunction because she was offered an opportunity to walk away from the business with her contribution returned, not because she was somehow in the wrong or leading a life with less than exemplary conduct.

Even assuming that Foote's dealings with the pharmacy were appropriate, the trial court could have still determined that the pharmacy litigation weighed against Foote in her petition for reinstatement because, in her self-represented pleading, Foote sought relief not just for herself, but also for an individual and three separate business entities, whom, as a former attorney without a license, she had no authority to represent.

Given the serious nature and degree of Foote's misconduct, as well as her negative attitude toward the administration of justice, we cannot say that the trial court's findings that Foote had failed to satisfy her burdens by a preponderance of the evidence was arbitrary, unreasonable, or decided without reference to guiding rules or principles. We therefore conclude that the trial court did not abuse its discretion by denying Foote's petition for reinstatement.

## CONCLUSION

The trial court's judgment is affirmed.

/s/     Tracy Christopher
        Chief Justice

Panel consists of Chief Justice Christopher and Justices Zimmerer and Wilson.